UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 FEB 14 AM 11: 41.

U.S. ........ ......

N.D OF ALABAMA

| | |
|---|---|
| GREEN & PEOPLES & ASSOCIATES, )<br>INC., *et al.*, )<br> )<br>　　　　Plaintiffs, )<br> )<br>vs. )<br> )<br>CITY OF BIRMINGHAM, )<br>BIRMINGHAM BOARD OF ZONING )<br>ADJUSTMENT, )<br> )<br>　　　　Defendants. ) | Civil Action No.: CV-99-S-1247-S |

ENTERED

FEB 1 4 2002

## MEMORANDUM OPINION

Plaintiffs, who are recovering substance abusers and operators or residents of a group home

for recovering substance abusers, contend that defendants discriminated against them on the basis

of their handicap by denying plaintiffs permission to operate a substance abuse recovery facility in

the Woodlawn neighborhood of Birmingham, Alabama. The action is presently before the court on

defendants' motion for summary judgment. Upon consideration of the pleadings, briefs, and

evidentiary submissions, the court concludes that the motion is due to be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is

proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain

language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at

37

trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See, e.g., id.* at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (per curiam). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S. Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

When deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving party and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjecture, does not create a genuine issue of material fact.

2

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal marks and citations omitted)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. at 2512.

## II. STATEMENT OF FACTS

In August of 1997, plaintiff Darryel Green ("Green") leased property at 5009 Georgia Road in the Woodlawn neighborhood of Birmingham, Alabama, in order to create a group home for men recovering from alcohol and substance abuse.[1] This was not the first time Green had begun such a rehabilitative project; Green had, in the months previous, operated a group home, called "I Have

---

[1] Complaint at 5. This court notes that the complaint states that plaintiffs leased the 5009 Georgia Road property in August of 1977, and assumes that plaintiffs intended to state that the property was leased in August of 1997.

3

a Dream," at 10th Avenue North in Birmingham, about three blocks from the 5009 Georgia Road location.[2] The "I Have a Dream" group home closed after less than six months of operation, however, once Green learned that the group home was located in an area not zoned for a recovery facility.[3] Green explained that this closing resulted after a friend, who ran two similar recovery facilities in another neighborhood in Birmingham, informed him that he needed to check with the City to determine whether the "I Have a Dream" home met local zoning restrictions.[4] When Green "called down" to the city's zoning office, he learned that the area's zoning would not permit the "I Have a Dream" home to continue to operate.[5]

As a result, Green abandoned the "I Have a Dream" group home, and plaintiffs began operating the 5009 Georgia Road group home in December of 1997.[6] This group home was to be one of a number of recovery facilities located in the Woodlawn community, although it was the only group home available to men in the area.[7] Plaintiffs acquired the home without determining whether their use of the property complied with city zoning regulations.[8] Plaintiffs did obtain a communal living facility license for the property from the Jefferson County Health Department in 1997, 1998, and 1999, however.[9]

Green chose the 5009 Georgia Road site for various reasons, including: 1) the home was within walking distance of recovery meeting locations; 2) it was located on public bus routes to which its residents would need access; 3) it was located near businesses that would hire the

---

[2] Defendants' evidentiary submissions, Ex. 9 (Sept. 14, 2000 Deposition of Green), at 25-26.

[3] *Id.*

[4] *Id.* at 26-27.

[5] *Id.* at 27.

[6] *See* Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 37.

[7] Complaint ¶ 16.

[8] *See* Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 106-07.

[9] *See id.* at 38, 42.

residents; 4) the property was large enough for the group home's purposes, and 5) Green believed the group home would help to rid the Woodlawn neighborhood of substance abusers.[10]  The group home operated in a family-like setting:  residents shared responsibilities, meals, and recreational activities; residents also worked, and attended school, treatment programs, and religious services in the local community.[11]  Residents were intended to live at the facility for long-term periods (measured in years), but could not qualify to live at the group home unless they were free of drugs and alcohol.[12]

In December of 1997, at the time of the 5009 Georgia Road group home's opening, Green and Howard Peoples formed Green & Peoples & Associates ("GPA"), a non-profit Alabama corporation, to operate the group home.[13]  GPA's Board of Directors was charged with carrying out the group home's mission of providing housing to recovering substance abusers in a drug- and alcohol-free environment.[14]  Along with Green, Peoples was a member of the Board.[15]  Peoples also served as resident manager of the 5009 Georgia Road group home.[16]  Plaintiffs Jesse J. Carroll, Jesse Lavender, and Alonzo P. Brown all were recovering substance abusers who became residents of the group home, and all qualified for disabled or handicapped status.[17]

Plaintiffs were notified in September of 1997, prior to the opening of the facility and following an inspection by the city fire department, that the group home would need to comply with

---

[10] *See* Complaint ¶ 18.

[11] *See id.* ¶¶ 35-38.

[12] *See id.* ¶¶ 42-43.

[13] *See id.* ¶ 19.

[14] *See id.* ¶ 20.

[15] *See id.* ¶ 21.

[16] *See id.* ¶ 25.

[17] *Id.* ¶¶ 26-28, 29-30.

local zoning restrictions.[18]  Specifically, plaintiffs were in violation of the City's property use regulations for an "R-5 Multiple Dwelling District," which restricts the use of a building or other premises, in part, to:

> [r]eligious, educational, charitable or public institution or building, *except* a penal or mental institution or *a communal living facility*.  Permitted uses are schools, churches, and residential accessory uses limited to rectories, parsonages and dwellings for resident administrators, watchmen, custodians or caretakers.  Other similar institutional uses not within 1000 feet of such uses are permitted on appeal, subject to approval of the Zoning Board of Adjustment.[19]

The term "communal living facility" is defined to include "buildings or structures in which three or more unrelated persons reside, in any dwelling unit."[20]

In December of 1997, plaintiffs received a Notice of Zoning Violation from the City.[21]  It was not until May of 1998, however, that plaintiffs applied for a license to operate the group home.[22] The application was rejected because the City determined that the group home would violate zoning ordinances that prohibited "communal living facilities"[23] in an "R-5 Multiple Dwelling District."[24] The City also declined to grant the group home a license on the grounds that the 5009 Georgia Road facility was located within 1,000 feet of another such communal living facility.[25]

Following the denial of the operating license by the City, Green and Peoples appealed to the

---

[18] *See* Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 107.

[19]  Birmingham, Ala., Zoning Ordinances art. I, § 7.2 (2000) (emphasis supplied).

[20] City of Birmingham Zoning Ordinances, Definitions § 1.13.

[21] *See* Defendants' evidentiary submissions, Ex. 7 (Sept. 8, 2000 Deposition of Green), at 31, 36.

[22] Complaint ¶ 44.

[23] Birmingham zoning ordinances define a communal living facility as

not meant to include child foster care facilities nor facilities housing the mentally handicapped or mentally ill, where there are no more than 10 such people plus 2 unrelated persons to either the occupants of the facility or each other.

Birmingham, Ala., Zoning Ordinances, Definitions, at Section 1, No. 13.

[24] Complaint ¶¶ 49-51.

[25] *Id.*

6

Birmingham Zoning Board of Adjustment ("ZBA") for a variance and special exception that would enable them to operate the 5009 Georgia Road group home in the Woodlawn neighborhood.[26]  As part of that process, the City notified residents of the Woodlawn community that plaintiffs sought a variance, and required plaintiffs to seek the approval of the Woodlawn Neighborhood Association to operate the group home.[27]  The neighborhood association's members opposed the variance request, but ultimately voted, in August of 1998, to approve the 5009 Georgia Road group home's continued operation.[28]  When Green and Peoples's application came before the ZBA the following month, however, (despite the association's prior approval), the ZBA denied the request for a variance and special exception, and ordered plaintiffs to immediately cease operation of the group home.[29]

Green and Peoples responded by appealing the final ZBA decision to the Circuit Court for Jefferson County, Alabama, in October of 1998.  Plaintiffs later requested, however, in April of 1999, that the Jefferson County Circuit Court dismiss their action without prejudice (which it did).[30]  Plaintiffs subsequently filed their complaint in this court on May 18, 1999, pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*, the Alabama Fair Housing Law, Alabama Code § 28-8-1 *et seq.*, Title II of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12131 *et seq.*, the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*, and the Fourteenth Amendment to the United States Constitution.[31]  The 5009 Georgia Road

---

[26] *Id.*; *see also* Plaintiff's Memorandum of Law in Opposition at 5.

[27] Complaint ¶ 63; Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 310-11.

[28] Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 311-14.

[29] Complaint ¶¶ 64-65.

[30] *Id.* ¶¶ 69-72.

[31] Plaintiff's Memorandum of Law in Opposition at 5.

group home ceased its operations in November of 1999.[32] This action presently is before the court on defendants' motion for summary judgment.

## III. DISCUSSION

**A.    Plaintiffs' Fourteenth Amendment Equal Protection and Due Process Claims**

The Equal Protection Clause of the Fourteenth Amendment precludes a state from denying to "any person within its jurisdiction the equal protection of the laws." Const. amend XIV, § 1. The "general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). States are afforded "wide latitude" in enacting social or economic legislation, and the "Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. The Supreme Court has noted, however, that this "general rule" is superceded by a strict scrutiny analysis "when a statute classifies by race, alienage, or national origin." *Id.* Heightened scrutiny by federal courts also comes into play when a plaintiff's gender, "personal rights," or illegitimacy is at issue. *Id.* at 440-41, 105 S.Ct. at 3254-55. Plaintiffs do not claim that any of these suspect classes are implicated by the City's communal living facility ordinances, and instead base their claims on the individual plaintiffs' handicaps (persons recovering from substance and alcohol abuse).

In the absence of a suspect classification, the court tests these ordinances under the rational basis test described in *City of Cleburne*, and elucidated by the Eleventh Circuit in *Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995). As the *Haves* Court stated:

---

[32] *See* Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 46.

8

The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose — a goal — which the enacting government body *could* have been pursuing. The *actual* motivations of the enacting governmental body are entirely irrelevant. [*FCC v. Beach Communications, Inc.,* 508 U.S. 307, ___, 113 S.Ct. 2096, 2102, 2103, 124 L.Ed.2d 211 (1993)]; *Panama City Medical Diagnostic Ltd. v. Williams,* 13 F.3d 1541, 1546 (11th Cir.), *cert. denied,* 513 U.S. 826, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994). Moreover, the Equal Protection Clause does not require government decisionmakers to articulate any reason for their actions, *Beach Communications,* 508 U.S. at ___, 113 S.Ct. at 2102; [*Nordlinger v. Hahn,* 505 U.S. 1, ___, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992)] nor does it require any record evidence of a legitimate purpose. *Panama City,* 13 F.3d at 1546.

The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose. "The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body." *Panama City,* 13 F.3d at 1547. As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal "is not so attenuated as to render the distinction arbitrary or irrational," the legislation survives rational-basis scrutiny. *Nordlinger,* 505 U.S. at ___, 112 S.Ct. at 2332. As with the legitimate purpose inquiry, courts are not confined to the record when determining whether a rational basis for the classification exists. *Beach Communications,* 508 U.S. at ___, 113 S.Ct. at 2102; *Panama City,* 13 F.3d at 1545. In sum, "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Beach Communications,* 508 U.S. at ___, 113 S.Ct. at 2102 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)).

*Haves,* 52 F.3d at 921-22 (emphasis in original).

Plaintiffs appear to claim, albeit in just one sentence and without explaining why, that the Supreme Court's decision in *City of Cleburne* controls the instant case, because the Court "prohibited a city from requiring a special use permit for a group home for mentally retarded persons ...."[33] Nevertheless, the City of Birmingham has clearly identified a legitimate governmental purpose in enacting the zoning ordinances at issue here. In doing so, defendants have offered the affidavit of William Thomas Magee, Chief Planner with the Department of Planning, Engineering,

---

[33] Plaintiffs' Memorandum of Law in Opposition at 18.

and Permits for the City of Birmingham, and the records custodian and technical advisor to various

planning and zoning commissions and committees for the City.[34]  Magee explained the origins of

the zoning regulations now at issue:

> The amendments to the Zoning Code of the City of Birmingham resulting in the
> *adoption of the Communal Living Ordinance came about because of the rapid*
> *proliferation of boarding, rooming and transitional homes in [Birmingham] .... The*
> *growth of these homes was due in large part to the growing numbers of elderly who*
> *[were] unable to afford private nursing home care; the deinstitutionalization of*
> *persons released from state mental institutions and prisons* due to the decisions in
> the *Wyatt v. Stickney* and *Lynch v. Baxley* cases and their progeny; *and,*
> *establishment of facilities for recovering substance abusers.*  These decisions,
> causing the release of thousands of chronically mentally ill persons from the early
> 1970s and into the 1980[]s into Jefferson County, resulted in a great infusion of
> individuals needing a place to live. As few regulated facilities existed to accept these
> individuals, one alternative for them was to find housing in rooming or boarding
> homes.  Board and rooming houses rapidly began to locate in [Birmingham],
> generally in areas which were declining because the property was cheap. *Because*
> *of the over concentration of these facilities in certain locations in [Birmingham], the*
> *facilities themselves became the dominant feature of the area and significantly*
> *changed the residential character of the neighborhood.*  Due to concerns and
> complaints from citizens about these largely unregulated facilities and the impact on
> these neighborhoods, a planning advisory committee was formed to determine how
> to address this concern.[35]

Having thus identified a legitimate governmental purpose for the adoption of this so-called

"Communal Living Ordinance," the court next examines whether a rational basis existed for

defendants to believe that the ordinance would further the City's stated purpose for its adoption,

namely, to "prevent the destabilization of neighborhoods and to prevent the creation of social service

ghettos which defeat the purpose and effort of integration of those in need of care and supervision

into the community."[36]  The Community Development Department elaborated on that purpose in a

report on the ordinance submitted to the City Council on October 9, 1984:

---

[34] Defendants' evidentiary submissions, Ex. 2 (Affidavit of Magee), at 1-2 (emphasis added).

[35] *Id.* at 2 (citations omitted) (emphasis supplied).

[36] Defendants' Memorandum Brief at 7 (citing Defendants' evidentiary submissions, Ex. 2 (Affidavit of
Magee)).

The legislation under consideration proposes to authorize the Zoning Board of Adjustment to permit Communal Living Facilities to locate in all residential districts subject to meeting four criteria of spacing, licensing, housing code compliance and non-transferability of the Zoning Board of Adjustment permit. The committee should be aware that the Zoning Board of Adjustments' jurisdiction over such uses can go beyond these criteria. Its discretionary authority under Article XXVI also empowers it to deny an application if all criteria are met or even to waive these criteria and grant an application.[37]

According to Magee, these communal living facilities were multiplying most rapidly in those areas in which property was least expensive, causing the facilities to become the dominant feature of the neighborhood.[38]  Before the City approved the ordinance, for example, it identified approximately 138 such facilities in Birmingham, the majority of which were concentrated in just three neighborhoods: Highland Park, Southside, and Norwood.[39] The October 9, 1984 Community Development Department report further explained that,

[i]n addition to increases in the number of Communal Living Facilities and their tendency to concentrate, the kinds of facilities have also changed. This change has been most notable in the facilities that are currently grouped under boarding house and rooming house definition. Since 1974, the Department of Building and Inspections has included group homes for the mentally retarded and mentally ill, transitional homes for drug rehabilitation therapy, as well as other similar facilities, under the definition of boarding house and rooming house (which are permitted uses in multi-family zone districts).

*Despite the growth and the changes in the role and the composition of some of these facilities, there has been little corresponding increase in the control of Communal Living Facilities by the city, county or state governments.*

Boarding and rooming houses are ... required to meet housing code standards of the city and similar housing standards of the County Health Department. However, the composition and role of these facilities has changed to such an extent that more regulation seems in order ....[40]

It is plausible, then, that permitting communal living facilities to operate in *all* Birmingham

---

[37] Defendants' evidentiary submissions, Ex. 1 (Ex. 1 to Affidavit of Paula Smith).

[38] *See* Defendants' Memorandum Brief at 5.

[39] *See id.* at 4.

[40] Defendants' evidentiary submissions, Ex. 1 (Ex. 1 to Affidavit of Paula Smith) (emphasis supplied).

11

neighborhoods, albeit subject to spacing, licensing, housing code compliance, and non-transferability requirements, arguably would stem the overconcentration of communal living facilities in a minority of city neighborhoods. Plaintiffs thus cannot make a credible argument, especially "under the lenient rational-basis standard," that the communal living ordinance would not have furthered the purpose stated for the ordinance's adoption. *Haves*, 52 F.3d at 922. Because defendants have satisfied the two-part test set forth in *Haves*, plaintiffs' Equal Protection claim consequently fails.

Plaintiffs also contend that defendants have deprived them of their Fourteenth Amendment due process rights. Plaintiffs assert that the City's zoning ordinance divests them of "the right to use their property 'free from arbitrary or irrational zoning actions,'" and that such a due process deprivation can be demonstrated even in the absence of proof of defendants' discriminatory motivations.[41]

A municipal government may control land use within its jurisdiction for the public good, subject to constitutional limitations. *See Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1373-74 (11th Cir. 1993). One such constitutional limitation, that imposed by the Equal Protection Clause, is addressed in the foregoing discussion. Another of those limitations, namely the guarantees of the Due Process Clause, also is relevant here, and "define[s] the limits of constitutional rights a developer has and thus the constitutional claims he may make against the governmental entity that has restricted his use of land." *Id.* But for these constitutional limitations, "the Constitution does not prevent a local government from restricting, controlling, or limiting the development of land to promote what it perceives to be the general welfare interests of the community as a whole." *Id.* at 1374.

---

[41] Complaint ¶ 73.

A claimant may bring a Fourteenth Amendment due process challenge to land use restrictions, asserting that the government entity has restricted the land use "arbitrarily and capriciously."[42] *Id.* at 1373-74 (relying on *Eide v. Sarasota County*, 908 F.2d 716, 720-23 (11th Cir. 1990)). Substantive due process challenges to zoning regulations are analyzed under a rational basis standard. *See Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214 (11th Cir. 1995). Thus, a would-be land developer — like plaintiffs — has a right "not to have his use of his land restricted for reasons having no substantial relation to the public health, safety, morals, or general welfare." *Corn*, 997 F.2d at 1373-74.[43] Such a restriction would constitute an "invalid exercise of the police power." *Eide*, 908 F.2d at 721.

These challenges can be either "facial" or "as applied." *See Eide*, 908 F.2d at 722. Plaintiffs here appear to claim both.[44] Plaintiffs assert, first, that the zoning ordinances at issue are facially discriminatory because they make "distinctions between facilities for persons with a disability such as the Group Home and other facilities such as a '[r]eligious, educational, charitable or public institution or building.'"[45] Plaintiffs make specific reference here to the City's property use regulations for an "R-5 Multiple Dwelling District."[46]

It has been the law for more than seventy years that zoning regulations will not violate substantive due process unless they "are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S. Ct. 114, 121, 71 L.Ed. 303 (1926); *see also Greenbriar, Ltd.*

---

[42] *Id.* ¶ 84.

[43] This claim is distinguishable from a due process "takings" claim. A plaintiff bringing a takings claim must demonstrate that the "regulation goes 'too far,' destroying the value of the property to the extent that it has the same effect of a taking by eminent domain." *Eide*, 908 F.2d at 722.

[44] Complaint ¶¶ 74, 75, 84.

[45] *Id.* ¶ 74.

[46] *See supra* text accompanying note 19.

*v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989). Facial challenges to the ordinance require these plaintiffs to complain that the "mere adoption of the [ordinance] was arbitrary and capricious." *Eide*, 908 F.2d at 723.

The established inquiry in the Eleventh Circuit on this question has two-parts: "First, it must be determined whether there has been a deprivation of a federal constitutionally protected interest, and secondly, whether the deprivation, if any, is the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation." *Greenbriar, Ltd.*, 881 F.2d at 1577 (quoting *Rymer v. Douglas County*, 764 F.2d 796, 801 (11th Cir. 1985) (quotations omitted)). As this test is framed in the conjunctive, each part is dependent upon on a showing of the other. This court accordingly declines to consider the first prong, as it finds that plaintiffs have failed to satisfy the second.

Turning to the second part of the *Rymer* test, "courts have held that a deprivation of a property interest is of constitutional stature if it is undertaken for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis." *Greenbriar, Ltd.*, 881 F.2d at 1577 (quoting *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989) (emphasis omitted)). The question for this court, then, is whether there is a rational basis for the ordinance, or rather, a substantial relationship between the contested zoning ordinance and the public health, safety, morals, or general welfare of the City of Birmingham and its citizens. *See Village of Euclid*, 272 U.S. at 395, 47 S.Ct. at 121.

The Eleventh Circuit has declared various land use regulations to be reasonable and substantially related to the public health and general welfare. These have included community concerns about the effect of proposed developments on traffic, congestion, deterioration of the neighborhood, litter, noise, neighborhood property values, and increased demand for city services.

14

*See Corn*, 997 F.2d at 1375 (citing cases).  In *Corn*, the Eleventh Circuit considered a substantive

due process-based challenge to zoning ordinances, and determined that the ordinances there were

based on the general welfare concerns of the city and its residents.  997 F.2d at 1386.  The *Corn*

Court explained that "what counts is ... the motivation for the earlier action adopting the rezoning

ordinances and denying the site plan." *Id.*  That court weighed evidence of public hearings, planning

and zoning board committee meetings, recommendations to the City Council, and the comments of

concerned citizens, to find that the ordinances there were enacted in the general welfare interests of

the City.  *See id.* at 1376-85.

This court finds essentially the same evidence before it, in that the record contains a great

deal of detailed evidence to show that the ordinance at issue here was passed only after lengthy and

deliberate consideration by zoning and planning committees, and by the City Council, of the general

welfare of the residential communities affected by the growing numbers of communal living

facilities.[47]  It is further persuasive to this court, as it was to the Eleventh Circuit in *Corn, id.* at 1386,

that both sides had an opportunity to express their concerns to the City about the general welfare of

the people affected by the ordinance.[48]  These facts demonstrate that there is a substantial

relationship in the case at bar between the communal living facility ordinance and defendants'

concern for the "public health, safety, morals, or general welfare" of the City of Birmingham.

*Village of Euclid*, 272 U.S. at 395, 47 S.Ct. at 121.  As a result, this court finds that plaintiffs have

---

[47] *See* Defendants' evidentiary submissions, Ex. 1-2; *see also supra* text accompanying notes 34-40.  For example, the advisory committee worked for two years to compile a list of communal living facilities, along with a file of zoning articles and research, and ultimately to propose an ordinance to the Zoning Advisory Committee ("ZAC") for consideration.  Defendants' evidentiary submission, Ex. 2 (Affidavit of Magee), at 2-3.  The ZAC held public hearings on the ordinance in March of 1984, at which it heard comments from members of the community, including from operators of communal living facilities who supported the need for the ordinance.  *Id.* at 3.  The ZAC ultimately recommended to the City Council that the ordinance be adopted; in October of 1984, following a public hearing (at which the representatives of communal living facilities and neighborhood groups appeared), the City Council voted to adopt the ordinance.  *Id.* at 5-6.

[48] Defendants' evidentiary submissions, Ex. 4 (Affidavit of Carolyn Rasbury).

15

failed to demonstrate that defendants acted arbitrarily and capriciously — "a prerequisite for [their substantive due process] claim."[49] This claim for relief accordingly is due to be dismissed.

Plaintiffs also have brought an "as applied" challenge to the constitutionality of the zoning ordinance, complaining, alternatively, that defendants applied "facially neutral rules, policies, practices, and/or services to Plaintiffs in a discriminatory manner on the basis of disability."[50] Plaintiffs allege that defendants arbitrarily and capriciously enforced the communal living facility ordinance by denying them a permit to operate the group home.[51] *See Eide*, 908 F.2d at 723-24.

According to the Eleventh Circuit, an "as applied substantive due process challenge focuses on whether the actual decision to apply the zoning to the property was 'arbitrary and capricious.'" *Restigouche, Inc.*, 59 F.3d at 1212. "As long as there is [a] 'plausible, arguably legitimate purpose' for the application" of defendants' ordinances to plaintiffs, "summary judgment is appropriate unless [plaintiffs] can demonstrate that [defendants] could not possibly have relied on that purpose." *Id.* at 1214 (quoting *Haves*, 52 F.3d at 923). Defendants contend that plaintiffs were denied a variance and special exception to the ordinances because their facility was "less than 1000 feet from another communal living facility and would be contrary to the stated purpose of the ordinance to provide dispersal of communal living facilities."[52] Defendants refer here to the fact, which both Green and Peoples acknowledged in their depositions, that the 5009 Georgia Road group home was located within 1000 feet (660 feet, in fact) of at least one other group home. As Peoples testified:

A.    Now, there's a boarding home that's 640 feet away, and there's a women's recovery house right by the boarding home, and there's a —

Q.    Is that Bread and Roses?

---

[49] *Corn*, 997 F.2d at 1386.

[50] Complaint ¶ 75.

[51] *See id.*

[52] Defendants' Memorandum Brief at 34.

A.      Bread and Roses.

...

Q.      Now, the structure that is written up as being within a thousand feet of your facility is 813 50th Street North.  It's 660 feet away?

...

A.      Bread and Roses on Georgia Road, and also there's a rehab spot on Georgia Road right across the street from there.

Q.      And what you're speaking of is the group home for the handicapped?

...

        Are they within a thousand feet of your facility?

A.      Yeah.  Probably a thousand, maybe a thousand.[53]

The communal living facility ordinance prohibits these facilities from operating within 1000 feet of each other, and defendants' group home was located within 1000 feet from another such facility.  The court consequently finds that defendants had a rational basis for applying the ordinance to plaintiffs' facility.  Further, plaintiffs have failed to even attempt a showing that defendants could not have relied on this basis when denying plaintiffs' request for a variance and special exception, *see Restigouche, Inc.*, 59 F.3d at 1214, opting instead to merely refer this court to Supreme Court case law that permits a plaintiff to state a due process claim on the basis of city zoning ordinances.[54]  As such, plaintiffs' as applied substantive due process claim also fails, and all of plaintiffs' Fourteenth Amendment claims are due to be dismissed.

**B.      Plaintiffs' Fair Housing Act Claim**

        Plaintiffs next employ the Fair Housing Act ("FHA") to assert that defendants discriminated

---

[53] Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 266-68.

[54] Plaintiffs' Memorandum of Law at 18.

17

against plaintiffs on the basis of their handicapped status when defendants refused to grant plaintiffs a variance and special exception.[55] The Eleventh Circuit has stated that district courts are to apply the now familiar analytical framework that the Supreme Court announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), to determine whether a plaintiff can survive summary judgment on an FHA claim. *See Secretary, United States Department of Housing and Urban Development v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). According to the *Blackwell* Court:

> First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance that the legitimate reasons asserted by the defendant are in fact mere pretext. *Pollitt v. Bramel*, 669 F. Supp. 172, 175 (S.D. Ohio 1987) (Fair Housing Act claim) (quoting *McDonnell Douglas*, 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825) (citations omitted).

*Id.* Under that framework, regardless of the theory relied on, the plaintiff bears the initial burden of establishing a prima facie case of an FHA violation. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, Nos. 00-6318, 00-6354, 2002 WL 181154, at *7 (2d Cir. Feb. 5, 2002).

In applying the *McDonnell Douglas* analysis to an FHA claim, "[e]stablishment of the prima facie case in effect creates a presumption that the [defendant] unlawfully discriminated against the

---

[55] Plaintiffs, in Count II of their complaint, also bring housing discrimination claims against defendants pursuant to Alabama fair housing laws. As plaintiffs concede, the Alabama Fair Housing Act is to be construed concomitant with the federal fair housing laws. As such, this court dismisses plaintiffs' state housing discrimination claims on the same grounds that it dismisses plaintiffs' federal housing discrimination claims.

[plaintiff]." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the [defendant] the burden of producing legitimate, non-discriminatory reasons for the challenged ... action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 685, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

The defendant's burden at the second stage of analysis "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Hicks*, 509 U.S. at 509, 113 S.Ct. at 2748). "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094 (citation and footnote omitted)). Indeed, "the [defendant] need only produce admissible evidence which would allow the trier of fact rationally to conclude that the ... decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096.

If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the ... decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096, then the "rebuttable presumption" of discrimination created by the demonstration of a prima facie case is refuted, "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S.Ct. at 1094-95 & n.10. In this final step of the analytical process, the plaintiff must be afforded the opportunity

19

to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the [defendant] were not the real reasons for the adverse [housing] decision." *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). The plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the [defendant]'s proffered 'legitimate reasons were not what actually motivated its conduct' ...." *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*). The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Plaintiffs maintain that the FHA was enacted to prohibit "discrimination in the sale or rental, or 'to otherwise make unavailable or deny,' a dwelling" because of an individual's handicap.[56] Plaintiffs rely on decisions of the First and Second Circuits to argue that housing can be made "unavailable" for purposes of the FHA by "local governments [that] use their zoning or other land-use powers to block" access to housing,[57] and cite legislative history to evidence that the FHA protects handicapped individuals from discrimination *via* zoning decisions and practices.[58] In light

---

[56] Plaintiffs' Memorandum of Law at 7.

[57] *Id.* at 7-8.

[58] *Id.* (citing H.R. Rep., No. 100-711, at 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173).

of this protection, plaintiffs attempt to establish that defendants discriminated against them by making group housing unavailable in violation of the FHA.

A plaintiff can prove a violation of the FHA by demonstrating: 1) a defendant's discriminatory intent; 2) the discriminatory impact or effect of a defendant's actions; or 3) a defendant's refusal to make a reasonable accommodation for a plaintiff's housing needs. *See Larkin v. State of Michigan Department of Social Services*, 89 F.3d 285, 289-90 (6th Cir. 1996); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *Smith and Less Associates, Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996); *Baggett v. Baird*, No. CIV. A. 4:94CV0282-HLM, 1997 WL 151544 (N.D. Georgia Feb. 18, 1997) (relying on *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir. 1995)).

Although both parties repeatedly misname, misstate, and misconstrue the nature of the FHA claims at issue in this case, plaintiffs appear to bring their claims under all three theories. Plaintiffs first contend that defendants are liable for violating the FHA under a theory of disparate treatment, because the City's ordinances are facially discriminatory, or, if facially neutral, intentionally have been applied to them in a discriminatory fashion.[59] Plaintiffs claim, second, that defendants' zoning restrictions had a discriminatory effect or disparate impact on them that was not justified by "a substantial governmental interest."[60] Finally, plaintiffs assert that defendants failed to make a reasonable accommodation to them, although the accommodation was necessary to afford plaintiffs an equal opportunity to housing.[61]

As with any question of statutory interpretation, this court begins with the language of the

---

[59] Complaint ¶¶ 75, 81.

[60] *Id.* ¶¶ 76-77.

[61] *Id.* ¶¶ 78, 80.

21

statute itself.  The FHA makes it unlawful to:

> discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of —
>
>> (A) that buyer or renter,
>>
>> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>>
>> (C) any person associated with that buyer or renter.
>
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of —
>
>> (A) that person; or
>>
>> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>>
>> (C) any person associated with that person.

42 U.S.C. § 3604(f) (1994).[62]  The Fair Housing Amendments Act of 1988 added the prohibition of

discrimination on the basis of handicap, and defined the term as follows:

> (h) "Handicap" means, with respect to a person —
>
>> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
>>
>> (2) a record of having such an impairment, or
>>
>> (3) being regarded as having such an impairment,
>
> but such term does not include current, illegal use of or addiction to a controlled

---

[62] 42 U.S.C. § 3604(f)(3) defines the term "discrimination," in part, as follows:

(A) a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling ....

substance (as defined in section 802 of Title 21).

42 U.S.C. § 3602(h) (1994). Congressional intent requires that both drug abuse and addiction be treated as handicaps, unless any of the three exclusions within the 1988 amendments applies.[63] Whether the plaintiffs here are handicapped is not in issue, however, as defendants concede that "the recovering addicts are handicapped within the meaning of the [FHA]."[64]

### 1.    Intentional discrimination and disparate treatment

In a leading case on FHA intentional discrimination claims, the Tenth Circuit has written that "a plaintiff makes out a prima facie case of intentional discrimination under the FHA merely by showing that a protected group has been subjected to explicitly differential — i.e., discriminatory — treatment." *Bangerter*, 46 F.3d at 1501; *see also Baggett*, No. CIV. A. 94CV0282-HLM, 1997 WL 151544, at *12. The Eleventh Circuit has held that to state a disparate treatment claim under 42 U.S.C. § 3604(a), "the plaintiffs must allege unequal treatment on the basis of [handicap] that affects the availability of housing." *Jackson v. Okaloosa County*, 21 F.3d 1531, 1542 (11th Cir. 1994). If plaintiffs can demonstrate that defendants' ordinances "single out the handicapped and apply different rules to them,"then "the discriminatory intent and purpose" will be evident from the face of the ordinances. *Bangerter*, 46 F.3d at 1500.

Plaintiffs assert that defendants' intentional discrimination and disparate treatment is evidenced by City ordinances that make a facially "unreasonable distinction between religious,

---

[63] These exclusions are (1) "current, illegal use of or addiction to a controlled substance ..."  42 U.S.C. § 3602(h); (2) "direct threat to health or safety of other individuals or [individuals] whose tenancy would result in substantial physical damage to the property of others"  42 U.S.C. § 3604(f)(9); and (3) "[conviction] by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance...."  42 U.S.C. § 3607(b)(4).

[64] Defendants' Memorandum Brief at 50.

educational and other public buildings or premises."[65]  Plaintiffs refer specifically to the City's

property use regulations for an "R-5 Multiple Dwelling District," which the City determined

controlled plaintiffs' group home.[66]  The ordinances define a communal living facility as

> not meant to include child foster care facilities nor facilities housing the mentally
> handicapped or mentally ill, where there are no more than 10 such people plus 2
> unrelated persons to either the occupants of the facility or each other.[67]

Defendants convincingly argue (and are unanswered by plaintiffs) that the ordinance's distinction

between communal living facilities and "religious, educational and other public buildings or

premises"[68] is based on the fact that the latter are not dwellings, and "are not for the purpose of

providing daily life activities and shelter."[69]

Plaintiffs also object that the Birmingham City Code of Ordinances "unreasonably

distinguishes group homes for recovering substance abusers from those that house individuals with

a different handicap."[70]  Plaintiffs refer to the fact, noted above, that the ordinance defining

"communal living facility" does not include "facilities housing the mentally handicapped or mentally

ill, where there are no more than 10 such people plus 2 unrelated persons to either the occupants of

the facility or each other."[71]  This distinction does not appear facially discriminatory, however, in

light of the fact that such homes for the mentally ill and handicapped do not resemble plaintiffs'

---

[65] Plaintiffs' Memorandum of Law in Opposition at 12.  The *McDonnell Douglas* standard is not appropriate in the case of a facial challenge to a statute based on a theory of disparate treatment. *See Elliott v. City of Athens*, 960 F.2d 975, 978 n.5 (1992); *see also Baggett*, No. CIV. A. 4:94CV0282-HLM, 1997 WL 151544, at *13.  *But see RECAP, Inc.*, Nos. 00-6318, 00-6354, 2002 WL 181154, at *7.

[66] *See supra* text accompanying note 19.

[67] Birmingham, Ala., Zoning Ordinances, Definitions, at Section 1, No. 13.

[68] *Id.*

[69] Defendants' Memorandum Brief at 24.

[70] *Id.*  Defendant City determined that the 5009 Georgia Road group home was a "communal living facility" that was located within 1000 feet of another communal living facility.

[71] Birmingham, Ala., Zoning Ordinances, Definitions, at Section 1, No. 13.

24

group home for recovering substance abusers. In its October 9, 1984 report to the City Council, the Community Development Department noted that "transitional homes licensed by the State Department of Mental Health" must meet state licensing, staffing, and eligibility requirements.[72] As the report explained,

> [i]t is obvious from this discussion that *Communal Living Facilities are different [than mental health group homes] with respect to their composition and the degree to which they are regulated.* However, that all share two important characteristics in that they permit three or more unrelated individuals to live together and they tend to concentrate in neighborhoods that are zoned predominantly multi-family. In considering the ordinance before it, the committee's primary concern should be the effects that these similarities will have on the residential character of neighborhoods in which Communal Living Facilities will be located.[73]

Moreover, plaintiffs have not demonstrated that the communal living facility ordinances single out recovering substance abusers on their face, as in *Bangerter*, in which the Tenth Circuit determined that a statute that applied only to the handicapped was facially discriminatory. 46 F.3d at 1500 (holding ordinance that required group homes for handicapped to have 24-hour supervision and establish community advisory committee was facially discriminatory under FHA). In fact, the ordinances address communal living facilities generally, and without reference to substance abuse recovery homes. All communal living facilities are subject to the use restrictions, and all such facilities are subject to a 1000-foot spacing limitation.

Even so, discriminatory intent can be inferred from the "totality of the circumstances." *LeBlanc-Sternberg*, 67 F.3d at 425. Plaintiffs here allege that defendants intended to discriminate against plaintiffs' group home because "Aldrich Gunn, a Birmingham City Councilman, spoke out

---

[72] Defendants' evidentiary submissions, Ex. 1 (Ex. 1 to Affidavit of Paula Smith), at unnumbered page 1.

[73] *Id.* at unnumbered page 2 (original emphasis omitted, emphasis supplied).

against the plaintiffs' recovery house. He stated that '...it has to come through me.'"[74]  Plaintiffs also

point to flyers, handed out by Woodlawn neighborhood residents (none of whom are city officials),

that opposed the plaintiffs' recovery home.[75]  The Second Circuit, relying on a decision from the

Eighth Circuit, has noted that racist statements and criticism "'cheered at public meetings' could be

considered evidence of an improper purpose." *Id.* at 425-26 (quoting *United States v. City of Black

Jack*, 508 F.2d 1179, 1183 n.3 (8th Cir. 1974)).

This court does not base its discriminatory intent analysis solely on the conduct of those who

opposed plaintiffs' group home, however.  Instead, when assessing the totality of the circumstances,

this court follows the lead of the Second Circuit, which, relying on Supreme Court authority,

enumerated other factors to examine when gauging discriminatory intent, including,

> "the fact if it is true, that the law bears more heavily on one group than another,"
> *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976),
> as well as
>
>> the historical background of the decision ...; the specific sequence of events
>> leading up to the challenged decision, ...; contemporary statements by
>> members of the decisionmaking body ...' ... and substantive departures ...,
>> particularly if the factors usually considered important by the decisionmaker
>> strongly favor a decision contrary to the one reached.

*LeBlanc-Sternberg*, 67 F.3d at 425 (citations and internal quotation marks and alteration omitted)

(quoting *United States v. Yonkers Board of Education*, 837 F.2d 1181, 1221 (2d Cir. 1987) (quoting,

in turn, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267-

68, 97 S.Ct. 555, 564-65, 50 L.Ed.2d 450 (1977))).

In the words of the Eighth Circuit, in a case on similar facts, this court "believe[s] the City's

---

[74] Plaintiffs' Memorandum of Law in Opposition at 10; *see also* Defendants' evidentiary submissions, Ex. 6 (Deposition of Peoples, Sept. 7, 2000), at 313-14.

[75] Complaint at Ex. 1-2.

enforcement actions were lawful regardless of whether some City officials harbor prejudice or unfounded fears about recovering addicts." *Oxford House v. City of St. Louis*, 77 F.3d 249, 252 (8th Cir. 1996). Turning to the *LeBlanc-Sternberg* factors, this court has already concluded that the historical background of the ordinances' adoption does not evidence an intent by defendants to target recovering substance abusers for discrimination on the basis of their handicap.[76] Further, defendants have offered evidence to show that the decision to deny plaintiffs' variance and special exception was based on the fact that the 5009 Georgia Road group home was located less than 1000 feet from another communal living facility (a primary cause for the ordinances' passage).[77] Moreover, plaintiffs have offered no evidence that defendants' adverse zoning decision constituted a "substantive departure," or that the decision was made despite factors that defendants ordinarily would consider favorable to granting plaintiffs' request. *See id.*

Further, plaintiffs have not shown that defendants intentionally devised or enforced these ordinances to exclude group homes for the handicapped, or more particularly, for recovering substance abusers, from the Woodlawn neighborhood. *Okaloosa County*, 21 F.3d at 1542 (holding that the plaintiffs there had demonstrated that the defendants intentionally created a racially segregated public housing market by adopting a policy intended to exclude public housing from areas that were predominantly white). Indeed, the court notes that, by plaintiffs' own admission, the 5009 Georgia Road group home was located in close proximity to a substance abuse group home for women and children, and to another group home for the handicapped.[78] Plaintiffs instead would need to make a showing like that in *Horizon House Developmental Services, Inc. v. Township of Upper*

---

[76] *See supra* text accompanying notes 35-40.

[77] *See supra* text accompanying notes 18-25, 53, 87.

[78] *See supra* text accompanying note 53 (quoting Defendants' evidentiary submissions, Ex. 6 (Sept. 7, 2000 Deposition of Peoples), at 266-68).

*Southampton*, in which the plaintiffs showed that "the 1000-foot rule contained in Ordinance No. 300 explicitly restrict[ed] the location of group homes for people with handicaps and cap[ped] the number of people with handicaps that can live in the Township."  804 F. Supp. 683, 694 (E.D. Pa. 1992). Absent such proof, plaintiffs' claim is due to be dismissed.

### 2.    Discriminatory effect or disparate impact

Plaintiffs next allege that the City's zoning ordinance had a discriminatory effect or disparate impact on group homes, thereby making housing unavailable in violation of the FHA.[79]  The Eleventh Circuit has held that "the Fair Housing Act prohibits 'not only direct discrimination but practices with racially discouraging effects ...'; thus, a showing of a significant discriminatory effect suffices to demonstrate a violation of the Fair Housing Act." *Okaloosa County*, 21 F.3d at 1543 (citing cases). The disparate impact analysis of Title VII cases is applicable here, such that plaintiffs can establish a prima facie case by "showing that the challenged practice of the defendant actually or predictably results in racial discrimination; in other words that it has a discriminatory effect." *Huntington Branch, National Association for the Advancement of Colored People v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988).  In the context of plaintiffs' challenge to defendants' denial of the variance and special exception, then, "[t]o claim an FHA violation through significant discriminatory effect, a plaintiff challenging a zoning decision can show either that the decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside the group." *Housing Investors, Inc. v. City of Clanton, Alabama*, 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999).

Plaintiffs' arguments and assertions satisfy neither of these prima facie avenues.  It is

---

[79] Plaintiffs' Memorandum of Law in Opposition at 12.

problematic, for example, that plaintiffs fail to allege that group homes for substance abusers have suffered *as a unit* from the alleged discriminatory impact of defendants' actions. *See, e.g., Housing Investors, Inc.*, 68 F. Supp. 2d at 1299 ("A plaintiff arguing that a zoning decision has a ... disparate adverse effect must look at the group that has actually suffered the adverse effect."). Green's deposition testimony does preliminarily suggest that the Woodlawn neighborhood was devoid of any group homes for the handicapped:

> Q.    And how did you come to talk about the recovery house [with Howard Peoples]? ...
>
> ...
>
> A.    I think it was my idea.
>
> Q.    Was this before or after you bought the house?
>
> A.    Before.
>
> Q.    And then you talked to Mr. Peoples about it?
>
> A.    About what?
>
> Q.    The recovery house, what did you discuss, or how did you discuss the recovery house. What sorts of things did you talk about?
>
> A.    You know, I think I said that ... there wasn't a recovery house on our side of town. They had them all across town and another friend of mine had one across town.
>
> Q.    Who is that?
>
> A.    Ralph Sanders and one over in our side of town.

29

Q.    *There wasn't a recovery house in Woodlawn, is that what you're saying?*

A.    *Uh-huh (yes).*[80]

Peoples's testimony directly contradicts the suggestion that group homes were segregated out of the

Woodlawn neighborhood, however:

Q.    [L]et's get back to the facts and the details about how the City or the Zoning
      Board of Adjustment discriminated against the facility, the occupants, the
      owners or the operators?

A.    About all that I can say is that we were discriminated against.

Q.    By whom and how.

A.    By the City and Zoning.

Q.    How?

A.    I don't think that — I really don't think that the requirements that they placed
      for us to operate were appropriate requirements.  *You got a whole
      neighborhood full of group homes* and another thousand feet from each other
      and a bunch of other stuff.

Q.    And what are those, please?

A.    Bread and Roses and one state group home.  Bread and Roses, which is a
      woman's recovery facility.

Q.    Where is that?

A.    On Georgia Road.  And then you got a state —

---

[80] Defendants' evidentiary submissions, Ex. 7 (Sept. 8, 2000 Deposition of Green), at 100-01 (emphasis
supplied).

Q.      And what kind of recovery facility is it?

A.      It's for women and their kids.

Q.      Women and kids recovering from what?

A.      Substance abuse.

Q.      *So, there already is, in the neighborhood, a substance abuse facility?*

A.      *Right*.  A thousand feet from us, though, more than a thousand feet from us.

Q.      *But in the neighborhood there is such a facility?*

A.      *For woman* [sic].

        ...

A.      *Been there for 20, 25 years maybe.  Across the street was a state group home with handicapped folks.  Right across the street, you know.*[81]

Plaintiffs thus cannot demonstrate the segregative effect of defendants' zoning ordinances because group homes for the handicapped, or more specifically, for recovering substance abusers, were not excluded from the Woodlawn neighborhood or the City of Birmingham. *See Housing Investors, Inc.,* 68 F. Supp. 2d at 1299 (citing *Huntington*, 488 U.S. at 15, 109 S.Ct. at 276).  The evidence submitted forces the opposite conclusion, in fact:  group homes for the handicapped operate in both the Woodlawn neighborhood and others throughout the City of Birmingham.[82]  Further, according to defendants, "[z]oning records from the passage of the ordinance in October 1984 until ... 1991 ...

---

[81] *Id.*, Ex. 6 (Deposition of Peoples, Sept. 7, 2000), at 256-58 (emphasis supplied).

[82] *See, e.g., id.*, Ex. 9 (Sept. 14, 2000 Deposition of Green), at 26-27; *supra* text accompanying notes 4, 53, 80.

31

showed that 154 applications had been made for communal living facilities and that of that number only 42 were denied and that since 1984 the number of Communal Living Facilities had almost doubled."[83] This same evidence suggests that plaintiffs cannot establish that the ordinances make "housing options significantly more restrictive for members of a protected group than for persons outside the group." *Housing Investors, Inc.*, 68 F. Supp. 2d at 1298.

Again, while the court is obligated to draw all inferences from the evidence presented in the light most favorable to these plaintiffs, *see Spence*, 873 F.2d at 256, these inferences are not unqualified. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp.*, 43 F.3d at 592 (citation omitted). Plaintiffs do not offer evidence, for example, to show that only group homes for the handicapped or recovering substance abusers were among those denied during the 1984 to 1991 period referenced by defendants. Indeed, plaintiffs make simply a one-sentence assertion that "Plaintiffs were forced to close their recovery house because of the discriminatory actions of the Defendants."[84] Without more, plaintiffs have failed to establish a prima facie case of discriminatory impact.

### 3.     Failure to make a reasonable accommodation

The third FHA violation theory advanced by plaintiffs is that defendants failed to reasonably accommodate their housing needs, and that those accommodations were necessary to afford them an "equal opportunity to use and enjoy a dwelling."[85] The FHA prohibits defendants from

> making a dwelling unavailable to handicapped people on the basis of their handicap. 42 U.S.C. §3604(f)(1). In fact, the [FHA] requires [defendants] to make reasonable accommodation in its generally applicable zoning ordinances when necessary to give

---

[83] Defendants' Memorandum Brief at 10.

[84] *Id.* at 13.

[85] Plaintiff's Memorandum of Law in Opposition at 13.

a handicapped person "equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

*Oxford House*, 77 F.3d at 251.  A court's analysis of such claims is fact intensive, and requires a case-by-case determination. *See id.* at 1104 (quoting *United States v. California Mobile Home Park Management, Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994)).  In determining whether an accommodation is reasonable, courts consider

> the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations and the benefits that the accommodation would provide to the handicapped.  It may also consider whether alternatives exist to accomplish the benefits more efficiently. ... "Reasonable accommodations" do not require accommodations which impose "undue financial and administrative burdens," [*Southeastern Community College v. Davis*, 442 U.S. 397, 412, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979)], or "changes, adjustments, or modifications to existing programs that would be substantial, or that would constitute fundamental alterations in the nature of the program," *Alexander v. Choate*, 469 U.S. 287, 301 n.20, 105 S.Ct. 712, 720 n.20, 83 L.Ed.2d 661 (1985).

*Bryant Woods Inn, Inc. v. Howard County, Maryland*, 124 F.3d 597, 604 (4th Cir. 1997).

To require defendants to grant plaintiffs the requested accommodation (the variance and special exception) would directly "undermine the legitimate purposes and effects of existing zoning regulations," *Bryant Woods Inn, Inc.*, 124 F.3d at 604, and "would constitute fundamental alterations in the nature of the [zoning] program," *Alexander*, 469 U.S. at 301 n.20, 105 S.Ct. at 720 n.20. Defendants have shown that the communal living facility ordinance was enacted to stem the growing overpopulation of such facilities in a minority of neighborhoods in the City of Birmingham.[86] Plaintiffs' group home seeks to operate within 1000 feet of at least one, and possibly three, other communal living facilities.[87]

---

[86] *See supra* text accompanying notes 35-40.

[87] *See* Defendants' evidentiary submissions, Ex. 6 (Deposition of Peoples, Sept. 7, 2000), at 265-69.

33

Plaintiffs offer no evidentiary support or analysis for this theory, other than to summarily direct the court to *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096 (3d Cir. 1996).[88] *Hovsons, Inc.* is immediately distinguishable from the instant case, however. In *Hovsons, Inc.*, the Third Circuit held that the defendant could not refuse to permit *any* construction of nursing homes in *all* of its residential areas, because the defendant township could not demonstrate that granting nursing homes a variance would cause it undue financial and administrative hardship, or that a variance would require it to fundamentally alter its zoning program. *See id.* at 1104. Defendants have not refused to permit the operation of group homes for substance abusers in either the Woodlawn neighborhood, or in the City's residential neighborhoods generally. In fact, as previously observed, *plaintiffs'* evidence shows that other group homes for handicapped individuals operate in the Woodlawn neighborhood.[89] Without evidence to suggest the contrary, plaintiffs fail to raise a genuine issue of material fact as to whether defendants' denial of the variance and special exception was unreasonable. *See Elderhaven, Inc. v. City of Lubbock, Texas*, 98 F.3d 175, 178 (5th Cir. 1996). Plaintiffs' claims under this theory are due to be dismissed.

**C.    Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973**

Plaintiffs bring additional housing violation claims under Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973. Plaintiffs' arguments as to the substance of these alleged violations is reserved solely, however, to contending that these

---

[88] There is some disagreement among the Circuits as to which party carries the burden of proof on this theory. This court notes, nevertheless, that the Eleventh Circuit has made the blanket statement, that the tripartite *McDonnell Douglas* burden shifting analysis applies to FHA claims, which would saddle plaintiffs with the burden of proof on their reasonable accommodation claim. *See Blackwell*, 908 F.2d at 870; *see also Elderhaven, Inc. v. City of Lubbock, Texas*, 98 F.3d 175 (5th Cir. 1996) (rejecting the contention of the Third Circuit in *Hovsons, Inc.*, 89 F.3d at 1103, that defendant carries this burden, and noting that the text of the FHA does not evidence an intent by Congress to change the "normal rule that a plaintiff bears the burden of proving a violation of law ....").

[89] *See* Defendants' evidentiary submissions, Ex. 6 (Deposition of Peoples, Sept. 7, 2000), at 256-58.

statutes will permit plaintiffs to challenge defendants' zoning ordinances.[90] Plaintiffs thus fail to demonstrate how defendants' ordinances constitute a violation of either statute. Even if this court applied plaintiffs' threadbare FHA arguments to their ADA and Rehabilitation Act claims, plaintiffs still cannot meet their burden of proof and, thus, survive summary judgment.

As with the FHA, the ADA and the Rehabilitation Act prohibit public entities from taking action on the basis of handicap. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, Nos. 00-6318, 00-6354, 2002 WL 181154, at *4 (2d Cir. Feb. 5, 2002) ("*RECAP, Inc.*"). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability ... shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a) (1994) (emphasis supplied). As the Second Circuit has stated, "[a]ll three statutes apply to municipal zoning decisions." *See RECAP, Inc.*, Nos. 00-6318, 00-6354, 2002 WL 181154, at *4 (quoting *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999); citing also *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir. 1997), *overruled on other grounds by Zervos v. Verizon New York*, 252 F.3d 163, 171 n. 7 (2d Cir. 2001)). Further, plaintiffs can bring discrimination claims on theories of disparate treatment, disparate impact, or failure to make reasonable accommodation under all three statutes. *See RECAP, Inc.*, Nos. 00-6318, 00-6354, 2002 WL 181154, at *7 (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998); *Smith & Lee Associates, Inc. v. City of Taylor*, 102 F.3d

---

[90] Plaintiffs' Memorandum of Law at 15-16.

781, 790 (6th Cir. 1996)).

This court relies on the language of the Second Circuit in *RECAP, Inc.*, in which that court considered the claims of plaintiffs that the City of Middletown had discriminated against them by refusing to grant special-use permits to operate two halfway houses for recovering alcoholics. *See RECAP, Inc.*, Nos. 00-6318, 00-6354, 2002 WL 181154, at *1. The Second Circuit succinctly stated plaintiffs' burden of proof on those claims:

> To establish a prima facie case of discrimination under the FHA and the ADA, the plaintiffs must present evidence that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (emphasis added; citation and internal quotation marks omitted); *see also Smith & Lee Assocs.*, 102 F.3d at 790 (noting that to establish a prima facie case, the plaintiff must show "that discriminatory purpose was a motivating factor in the City's decision to deny ... [the] petition") (citation and internal quotation marks omitted). To establish a prima facie case of discrimination under the Rehabilitation Act, by contrast, the plaintiffs must show that the defendants denied the permit "solely" because of the disability. *See Flight v. Gloeckler*, 68 F.3d 61, 64 (2d Cir. 1995).

*See id.* at *7. This court has already determined that plaintiffs' FHA claims fail for lack of a sufficient prima facie showing; plaintiffs' ADA claims consequently fail on the same grounds.[91] *See id.* It stands to reason, then, that plaintiffs also cannot make a proper prima facie showing under the Rehabilitation Act, because plaintiffs cannot demonstrate that they were denied the variance and special exception *solely* on the basis of their handicapped status. *See id.* Accordingly, plaintiffs' ADA and Rehabilitation Act claims are due to be dismissed.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be granted. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

---

[91] *See supra* text accompanying notes 65-89.

DONE this _14th_ day of February, 2002.

_____
United States District Judge